UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
JOHN GILBERT,                      :
                                   :
                        Plaintiff, :
                                   :
            -v-                    :
                                   :
ROBERT INDIANA,                    :
                        Defendant. :
                                   :
----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED MAR 0 2 2012

09 CV 6352(KBF)

MEMORANDUM OPINION
& ORDER

KATHERINE B. FORREST, District Judge:

The theory of plaintiff John Gilbert's case is that he can, by contract, force an artist--here, defendant Robert Indiana--to acknowledge creation of a work that the artist did not create and does not like; and then, plaintiff could and would use such acknowledgement in selling such works to the public as authentic creations by the artist.  There are numerous reasons why plaintiff's claims fail and his claims must be dismissed.

This Court starts with the strong public policy against attempting to use a court of law to perpetrate a fraud upon the public.[1]  Even apart from that principle--which is strong and sufficient on its own, this Court finds that the contract at issue does not cover the work that plaintiff asserts it does.

---

[1] See, e.g., Roddy-Eden v. Berle, 108 N.Y.S.2d 597, 599 (Sup. Ct. N.Y. Cnty. 1951) (voiding an agreement which was created under "a scheme concocted and devised by the parties to deliberately foist a fraud on the public").

1

Defendant has moved for summary judgment on all of plaintiff's claims. That motion is GRANTED. Accordingly, judgment is entered in favor of defendant on plaintiff's claims.

BACKGROUND[2]

Defendant Robert Indiana created the iconic "LOVE" sculpture, which has the "O" positioned at an angle. (Def. Answer (Dkt. No. 22) ¶ 11; see also Decl. of Gary D. Sesser ("Sesser Decl.") (Dkt. No. 50) Ex. B(2).) Over the years, Indiana entered into a series of arrangements with plaintiff Gilbert that included the production and sale of "LOVE" rugs. (See Sesser Decl. Ex. B(1).)[3]

On August 2, 2007, Gilbert and Indiana entered into an agreement (the "Agreement") pursuant to which Indiana as the "Artist" and "Licensor" would create--and Gilbert would produce and sell (as the "Licensee")--objects with Hindi script designs of the word "love," or in Hindi, "Prem" (referred to as the "Indian Prem"). (Sesser Decl. Ex. B(14).) The Agreement states that its purpose "is to create an arrangement between the Artist

---

[2] The facts are undisputed unless otherwise stated. The Court recites only facts necessary for resolution of the motion on the grounds the Court addresses herein. The parties have both engaged in lengthy recitations of facts that need not be considered on this motion because the bases for dismissal rest solely within the four corners of the agreement at issue and the straight forward application of copyright law principles.

[3] Incidentally, defendant claims he has never received a proper accounting for any of those sales. (Dep. of Robert Indiana ("Indiana Dep.") at 81:16-18 (Reply Decl. of Gary D. Sesser ("Sesser Reply Decl.") (Dkt. No. 70) Ex. A).)

and the Licensee for the creation/production of the Artist's work Prem Love depicted in the attached photos and their derivative works." (Sesser Decl. Ex. B(14).)  It is undisputed that attached to the Agreement were three versions of the Hindi characters for "Prem." (Id.)  None of those three attachments uses the Latin letters from the English alphabet "P," "R," "E," or "M." (See id.)  The Agreement also contains a merger clause which states, in pertinent part:  "The Agreement contains the entire understanding between the parties." (Sesser Decl. Ex. B(14) at 2.)

The instant dispute relates to whether the Agreement encompasses another design, this one referred to as "English Prem."  English Prem is a design with block letters that uses the Latin letters from the English alphabet "P," "R," "E," or "M." (See Sesser Decl. Ex. B(16).)  The only similarity between Indian Prem and English Prem is not in design, but rather solely in the use of the word "Prem" (albeit in different languages and script).[4]

Indiana asserts that he never agreed to create English Prem, he did not conceive of the work, and never in fact created the work. (See Dep. of Robert Indiana ("Indiana Dep.") at

---

[4] As discussed below, the ultimate question, which is not a difficult one, is whether the Agreement--or the copyright law concept of a derivative work-- reaches a design that was not attached to the Agreement at the time it was executed. (See Dep. Tr. of John Gilbert ("Gilbert Dep.") at 121:21-24 (Sesser Decl. Ex. A).)  The question must be answered "no."

101:4-20, 102:20-22 (referring to English Prem as a "monstrosity"; "Q: And you have nothing to do with the authorship of this thing?  A: Nothing."; not wanting an English Prem that "looked like a refrigerator") (Reply Decl. of Gary D. Sesser ("Sesser Reply Decl.") (Dkt. No. 70) Ex. A).)  That said, the origin story for English Prem is undisputed:  Gilbert concedes that "English Prem" was in fact conceived by Gilbert's partner, Georg Friedrichs, in Germany (Indiana lives in Maine and it is undisputed that he was not in Germany at the time of the creation), the design was originally rendered by Friedrich, and Indiana never put pen to paper with respect to any design for English Prem.  (Dep. of John Gilbert ("Gilbert Dep.") at 121:6-14, 124:25-7, 174:22-23, 190:23-25 (Decl. of Gary D. Sesser ("Sesser Decl.") (Dkt. No. 50) Ex. A).)

Gilbert concedes that Indiana did not know anything about English Prem in 2007--i.e., the year the Agreement was signed. (See Gilbert Dep. at 127:20-128:6.)  Gilbert asserts, although this is disputed by Indiana, that Indiana "approved" or "adopted" the design for English Prem more than a year after Gilbert had begun selling "English Prem" items as authentic Indiana creations.  (Gilbert Dep. at 142:17-24.)  According to Gilbert, Indiana engaged in two acts of approval of the English Prem design that made English Prem part of the Agreement, and

that now require him to concede that he is, in fact, the creator
of all objects bearing the English Prem's design.  (Id.)

In January 2008, Gilbert notified Indiana by letter that
he would come to his island in Maine and see him about
an English "Prem."  (See Gilbert Dep. at 125:18-126:11; Sesser
Decl. Exs. B(17), B(18).)  He included two English Prem designs
with that letter. (Gilbert Dep. at 126:8-19; Sesser Decl. Exs.
B(17), B(18).)

In February 2008, Gilbert visited Indiana.  (Gilbert Dep.
at 132:12-17.)  Gilbert asserts that during that visit, he
presented Indiana with two textile versions of English Prem, one
with curvy lines, and another in block letters.  (Gilbert Dep.
at 132:18-23.)  According to Gilbert, Indiana pointed to the
block letter version and said "that is an Indiana."  (Gilbert
Dep. at 133:3-5.)  A friend of Gilbert's took a photograph of
Indiana standing over the two textile designs, appearing to be
looking at the block letter version.  (Decl. of John Gilbert
(Dkt. No. 67-1) Ex. 7.)[5]

Plaintiff also asserts that he showed Indiana "photos of
the proposed design" for English Prem "in three dimensional
ceramic sculpture form," that Friedrichs had sent to Gilbert, at

---

[5] Gilbert has offered this photograph in opposition to defendant's motion as
"evidence" that Indiana made the statement approving the design as his own.
(Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl. Opp'n") (Dkt. No. 67)
at 17. )

the February 2008 meeting.  (2/9/12 Decl. of John Gilbert
("Suppl. Gilbert Decl.") (Dkt. No. 70) ¶ 3.)[6]  Gilbert sent an
email to Friedrichs subsequent to that meeting with Indiana in
which he wrote, "Bob approved the ap prem," which was
referencing what is now referred to as English Prem.  (Id.; see
also id. at 2.)  There is no testimony from Indiana himself that
corroborates that assertion.  Without more, the email cannot be
considered for the truth of the matter asserted, see Fed. R.
Evid. 802--i.e., that Indiana approved of the sculpture.  Thus,
the Court does not have before it facts that evidence that
Indiana approved the English Prem in sculpture form at the
February 2008 meeting.  See Fed. R. Civ. P. 56.  Whether he did
or not, that would not change the outcome of this Court's
decision on the bases for dismissal here.

Indiana disputes that he ever approved the block-lettered
English Prem as "an Indiana."  (See Indiana Dep. at 101:20-22.)
According to Indiana, he thought that English Prem was "a
monstrosity" and "looked like a refrigerator."  (Indiana Dep. at
101:15-17, 104:18-20.)  As discussed below, this factual dispute
is ultimately immaterial to resolution of this motion.

---

[6] Plaintiff requested an opportunity to supplement his opposition to
defendant's motion for summary judgment after Friedrichs supposedly located
"new evidence that directly refutes facts claimed to be undisputed in [the]
motion for summary judgment."  (See Dkt. No. 74 at 3.)  This Court granted
the request on certain conditions. (See id. at 1-2.)

The second act relates to the Certificate of Authenticity related to the Indian "Prem" work.  In May 2009, Gilbert sold an object with the English Prem design to a client named Tovar. (Gilbert Dep. 149:18-25.)  The purchase price was $100,000. (Gilbert Dep. 164:8.)  In connection with that sale, Gilbert provided Tovar with a Certificate of Authenticity ("COA") which he signed, "As editor and publisher of the Robert Indiana Prem-Love Projects and holder of copyrights for all the original Robert Indiana fabric artworks, I hereby certify the authenticity of this Robert Indiana sculpture."  (Sesser Decl. Ex. B(36); see also Dkt. No. 74 at 3 (noting that the correct date for Gilbert's signing of the Certificate of Authenticity is 2009).)

In April 2009, Gilbert again visited Indiana.  (See Gilbert Dep. at 219:16-19.)  Gilbert requested that Indiana sign "for his client" the Certificate of Authenticity that Gilbert had previously provided to Tovar. (Gilbert Dep. at 218:4-219:19.) By that point, Tovar had learned that the item for which he had paid $100,000 might not be an authentic "Indiana" creation and demanded that Gilbert obtain a certificate of authenticity from Indiana or he would never buy from Gilbert again.  (Gilbert Dep. at 207:11-210:3; see also id. at 224:2-5.)  During Gilbert's visit and at Gilbert's request, Indiana wrote on the certificate "To Tovar," and signed the COA.  (Sesser Decl. at B(36); Indiana

Dep. at 162:16-21.)  Several days later, Indiana wrote to a
dealer that he was not the creator of English Prem and that his
signature on Tovar's COA was in the nature of a souvenir.
(Sesser Reply Decl. Ex. B(9).)  Once it was clear that Indiana
denied that he was the creator of English Prem, Gilbert was
unable to sell objects with that design at various auction
houses. (Gilbert Dep. at 228:23-229:2; Indiana Dep. at 160:3-8.)

This lawsuit followed shortly thereafter.  Plaintiff
asserts claims for breach of contract (Count I), tortious
interference with contractual relations (Count II), tortious
interference with prospective business relations (Count III),
unfair competition (Count IV), unjust enrichment (Count V),
negligent misrepresentation (Count VI), and a Lanham Act claim
for false claims and misrepresentations regarding authenticity
(Count VII).  Each of those claims is premised upon Indiana
being contractually bound as the creator of English Prem.

According to plaintiff, statements and actions cast doubt
on Indiana's role as creator, and therefore are actionable.  As
discussed below, that premise is unsupportable.  Once that
premise is removed, the bottom of plaintiff's case falls out and
his claims must be dismissed.

DISCUSSION

I.  STANDARD OF REVIEW

Summary judgment may not be granted unless all of the

8

submissions taken together "show that there is no genuine issue
as to any material fact and that the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c).  The
moving party bears the burden of demonstrating "the absence of a
genuine issue of material fact." Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  In making that determination, the court
must "construe all evidence in the light most favorable to the
nonmoving party, drawing all inferences and resolving all
ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d
732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the
non-movant's claims cannot be sustained, the opposing party must
"set out specific facts showing a genuine issue for trial," and
cannot "rely merely on allegations or denials" contained in the
pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554
F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere
speculation or conjecture as to the true nature of the facts to
overcome a motion for summary judgment," as "[m]ere conclusory
allegations or denials cannot by themselves create a genuine
issue of material fact where none would otherwise exist." Hicks
v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).
Only disputes over material facts--i.e., "facts that might
affect the outcome of the suit under the governing law"--will
properly preclude the entry of summary judgment. Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986) (stating that the nonmoving party "must do

more than simply show that there is some metaphysical doubt as

to the material facts").

II.  DOES THE AGREEMENT COVER ENGLISH PREM?

       Indiana does not dispute that the Agreement covers Indian

Prem.  (Cf. Indiana Dep. at 104:14-18.)  None of plaintiff's

claims relate to any actions by Indiana that cast doubt on the

authenticity of Indian Prem.  The sole issue is whether, on its

face, the Agreement encompasses English Prem and/or whether

Indiana approved or adopted English Prem such that it became a

part of the Agreement at a later date.  There is no triable

issue of fact on either of those points.

       A.   The Four Corners of the Agreement

       By its terms, the Agreement conveys a license to use,

distribute, sell, sublicense and promote what are defined as the

Licensed Works.  (See Sesser Decl. Ex. B (14) at 1.)  The

Licensed Works are defined as "the Artist's work Prem Love

depicted in the attached photos and their derivative works

(hereinafter collectively referred to as the 'Licensed Works')."

(Id.)  It is undisputed that English Prem was not among the

attached photos.  (Id.; see also Gilbert Dep. at 231:22-25.)

The question thus becomes whether English Prem is a "derivative work."  The answer is clearly "no."

To answer that question, it is necessary to go back to basics.  First, words and ideas are themselves not subject to copyright protection.  37 C.F.R. § 202.1(a) ("The following are examples of works not subject to copyright and applications for registration of such works cannot be entertained: (a) Words and short phrases, such as names, titles, and slogans . . .").  Thus, neither the word "Prem," nor the English version of that word, "love," is itself copyrightable.  Indiana obtained protection for his iconic "Love" design based upon the design or the expression of the word "love" contained in that design.

Second, a derivative work is defined as a "work based upon one or more preexisting works . . . in which a work may be recast, transformed or adapted." 17 U.S.C. § 101.[7]  For English Prem to constitute a "derivative work," it must plainly be based in some way upon Indian Prem.  Indian Prem is a design:  it does not use Latin letters; it is not in block form.  Apart from the fact that Indian Prem uses the word "Prem" in Hindi Sanskrit, there is no conceptual relationship between it and the Latin,

---

[7] A copyrightable derivative work must, therefore, be more than simply an idea about, or relating to, a pre-existing work.  The "copyrightability" of the purported derivative work(s) here is not in question.  For all intents and purposes, it has been assumed since a design involving the word "Prem" has been copyrighted.

block-lettered English Prem.  (Compare Sesser Decl. at Ex. B(14) at 4-6 with e.g., Sesser Decl. Ex. B(2).)

Arguing that English Prem--an entirely unrelated design in every way from Indian Prem--could constitute a derivative work of Indian Prem misunderstands the basic requirements for a derivative work under the copyright laws.  The fact that English Prem shares the word "Prem" with Indian Prem is of no moment. The mere sharing of a word--since, as discussed above, words in themselves are not copyrightable--cannot a derivative work make. The word "prem" is merely a conceptual link to the pre-existing Indian Prem design.  But concepts--or ideas--likewise are not subject to copyright.  37 C.F.R. § 202.01(b); Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32 (2d Cir. 1995) (recognizing that "copyright law does not protect ideas but only their concrete expression").  The design of English Prem itself is entirely unrelated to Indian Prem apart from that shared word "prem."  English Prem does not even share a significant design element with Indian Prem: they are written in different languages, with different characters.  Thus, use of the same word or concept alone cannot constitute a transformation, recasting or adaptation sufficient to meet the definition of a derivative work.  See 37 C.F.R. §§ 202.01(a), 202.01(b).

As a result, the argument that English Prem is a "derivative work" and thus fits within the definition of Licensed Works in the Agreement fails.  This action cannot proceed on that basis.  Thus, the question of whether Indiana "created" the alleged derivative work is one the Court never has to reach.

B.   The Statement: "This is an Indiana"

There is only one remaining question this Court must answer to determine the viability of this action:  whether either of the two actions Indiana took constituted "approval" or "adoption" of English Prem such that the Agreement covered that work.  That there is a factual dispute as to what did or did not occur on the occasions in question is irrelevant to the outcome of this issue.  Even taking plaintiff's version of the facts as true, the answer to the question is "no" as a matter of law.

As an initial matter, simple principles of contract law bar plaintiff's interpretation that the Agreement was amended to include English Prem.  There is nothing in the record indicating "mutual assent" by Gilbert and Indiana to amend the Agreement to include English Prem.  See Curreri v. Heritage Prop. Inv. Trust, Inc., 48 A.D.3d 505, 852 N.Y.S.2d 278, 281 (2d Dep't 2008).  There is nothing in writing or in the parties' actions or course of conduct that evidences an amendment to the Agreement.  See id.  Gilbert's belief that any of Indiana's actions modified the

Agreement, without more--and without even indicating as much to
Indiana orally, is insufficient to show an amendment of the
Agreement in the face of the Agreement's integration clause.
Cf. N. Metro. Res. Health Care Facil., Inc. v. Ledri Realty
Assocs., Inc., 179 A.D.2d 133, 137, 582 N.Y.S.2d 521, 523 (3d
Dep't 1992).

   Plaintiff makes two arguments to try to salvage his claims.
First, plaintiff argues that when he visited Indiana in February
2008 and showed him two designs for English Prem, Indiana
referred to one and said "this is an Indiana." (Gilbert Dep.
132:18-133:5.)  Plaintiff urges the Court to find that with that
act, Indiana conceded the authenticity of all objects made with
that design. (See Pl. Opp'n at 9-11.)  That is a Grand-Canyon-
like leap that cannot be made.  This Court understands
plaintiff's argument as using the statement "this is an Indiana"
to incorporate the design for English Prem to which Indiana was
referring into the original Agreement (which, as discussed
above, only covered Indian Prem).

   As discussed in Part II.A. supra, there is no basis upon
which to conclude that English Prem is cognizable as a
derivative work, and thus, in order for English Prem to be
encompassed by the Agreement, the Agreement would have to be
modified to include within the definition of "Licensed Works"
more than the attached photos of Indian Prem and derivative

14

works related thereto.  Plaintiff does not argue, and there is no evidence in the record, that the Agreement was modified to include a design that was outside of the scope of Indian Prem and derivative works of Indian Prem.  Accordingly, the statement "this is an Indiana" cannot achieve what plaintiff suggests it does.[8]  It is possible, most generously construed, that that statement at issue "adopted" the design to become "an Indiana" design.  That does not, however, convey the contractual use, distribution, sale, or other licensing rights in connection with that design.  It therefore cannot support any of plaintiff's causes of action.

Second, plaintiff argues that the Certificate of Authenticity ratifies English Prem as an "Indiana."  Based on the words on the page ("To Tovar," and signed by Indiana, positioned in blank space on the page, not above or below

---

[8] Plaintiff puts forth the affidavit of Michele Bechtell, "an art expert with 18 years of experience" in brokering, appraising, and promoting art as well as engaging in building art collections and art museum management, essentially to "ratify" Indiana's acts relating to English Prem, such that they would fall under the Agreement.  (See Pl. Opp'n at 2; see generally Decl. of Michele Bechtell ("Bechtell Decl.") (Dkt. No. 67-15).)  As an initial matter, given Ms. Bechtell's cursory statements about her experience and background (see Bechtell Decl. ¶ 2), the Court does not credit her as an "expert" in the field based upon the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  See Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997).  Second, even if the Court were to accept Ms. Bechtell's statements as true, for the same reasons discussed in the text, her statements about how artists engage in collaborative arrangements and how certificates of authenticity can issue (Bechtell Decl. ¶¶ 5-6), does not indicate that Indiana's acts brought English Prem under the scope of the Agreement.

Gilbert's authenticity signature (Sesser Decl. Ex. B(36)), no
rational juror could find that this act conveyed an intention to
make any and all versions of objects with the English Prem
design "authentic Indianas."  Those words cannot alone modify
the Agreement.  They do not mention the Agreement nor do they
mention the English Prem design even generally.  Most
generously, those words could relate to the single object that
is the subject of the COA.  (See Sesser Decl. Ex. B(36).)

On the facts in the record, construed entirely in
plaintiff's favor, there is no basis in copyright law or in the
facts for this Court to determine that the Agreement covers
English Prem.  Thus, all of plaintiff's claims, premised as they
are on the assumption that English Prem is covered by the
Agreement (see Am. Comp. (Dkt. No. 17) ¶¶ 31-36, 38, 42, 47, 51,
56, 61), fail.[9]

III. PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

Based upon the above reasoning, the Court finds that
amendment of the complaint to include Simon Salama-Caro would be
futile.  See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9
L.Ed.2d 222 (1962).  All plaintiff's claims in this action have
been dismissed.  Thus, plaintiff's potential Lanham Act claim
against Mr. Salama-Caro is wholly separate and apart from what

_____

[9] The Supreme Court's decision in Dastar Corp. v. Twentieth Century Fox Film
Corp., 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003), provides an
independent basis for dismissal of the Lanham Act claim.

remains now in this action.   Accordingly, plaintiff's motion to amend the complaint is denied.

CONCLUSION

For the aforementioned reasons, defendant's motion for summary judgment is GRANTED and plaintiff's motion to amend the complaint is DENIED.

The Scheduling Order in this matter (Dkt. No. 73) shall apply with full force and effect to all matters relating to defendant's counterclaims.

No later than March 9, 2012, the parties shall each submit a letter of no more than two pages single-spaced regarding their views as to (i) how this decision impacts defendant's counterclaims; and (ii) whether referral to Magistrate Judge Katz for purposes of settlement would be useful at this time.

The Clerk of Court is directed to terminate defendant's motion for summary judgment (Dkt. No. 49) and plaintiff's motion to amend the complaint (Dkt. No. 54).


SO ORDERED:

Dated: New York, New York
       March 2 , 2012


                          K——— B. Forrest
                    _____
                         Katherine B. Forrest
                    UNITED STATES DISTRICT JUDGE